IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DIANE KLAUS,

    Plaintiff,

v.

                                                                                   CASE NO. 1:20-cv-01105-JFR-KK

VILLAGE OF TIJERAS, JAKE
BRUTON, DON JOHNSON, FELIX
GARCIA and MAXINE WILSON,
In their individual and official capacities,

    Defendants.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARYJUDGMENT
AGAINST WPA AND FIRST AMENDMENT CLAIMS**

The defendants Jake Bruton, Don Johnson, Felix Garcia, Maxine Wilson ("the Individual Defendants") and the Village of Tijeras ("Village") (collectively, "Defendants"), by and through their counsel of record, hereby move the Court pursuant to F.R.C.P. 56 for partial summary judgment on Counts IV and VI of Plaintiff's complaint.  In support, Defendants submit the following memorandum in support:

    **I.**    **INTRODUCTION AND SUMMARY**

This case arises from Plaintiff's former employment with the Village as Deputy Clerk and as Acting Village Clerk.  In April, 2020, the Village terminated her employment after providing her with notice of termination, and a hearing at her request.  Plaintiff then brought her complaint in the Second Judicial Court of the State of New Mexico asserting six different counts against the Defendants.  Count IV asserts a violation of the New Mexico Whistleblower Protection Act at Section 10-16C-1 et seq. ("WPA").  Count VI alleges a violation of the right of "political association" as protected by the First Amendment of the United States Constitution.  Defendants

1

removed the case to this Court pursuant to 28 U.S.C. § 1441(c).

As demonstrated below, the Defendants are entitled to summary judgment as against both claims.  With respect to each claim, the evidence submitted herein establishes beyond genuine dispute that Defendants terminated Plaintiff for two legitimate, related reasons.  First, Plaintiff played a large role in improperly issuing more than $64,000 in checks to thirteen Village employees and officials, most notably to herself in the amount of $10,752.58, for claimed PERA reimbursements dating back to 2006 ("the PERA Checks").  Second, Plaintiff, as the Acting Village Clerk, failed to seek Village Council's budgetary approval, or even inform the Council, prior to issuing the PERA Checks.  Instead, she acquiesced to Mayor Gloria Chavez's improper decision to hide the issuance of the PERA Checks from the Village Council.

A formal audit and opinion of the New Mexico State Auditor's Office dated June 11, 2018, supports both grounds for termination.  Furthermore, Plaintiff's own testimony, including direct admissions, and her correspondence all reflect her significant role in the process, serving as both Acting Clerk and Deputy Clerk during the relevant time period.

Based on such incontrovertible evidence, Plaintiff cannot claim such reasons were not sufficient justification for her termination.  As a matter of law, the court should grant qualified immunity to the Individual Defendants against Plaintiff's First Amendment claims because there can be no constitutional violation where there is clear evidence of that Plaintiff's own actions warranted her termination. *Walton v. Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016).  Similarly, this same evidence of Plaintiff's work misconduct supports a general summary judgment determination against her First Amendment claim as against the Village, and against her claims under the WPA against all Defendants.

## II. MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE:

**A.      There is no genuine dispute that the PERA Checks were improper and should not have been issued:**

1.      A true and correct copy of a formal forensic report dated June 4, 2018, by the New Mexico Office of the State Auditor's Office ("OSA") regarding its "Special Audit of the Village's PERA and payroll records from January 1, 2006 through May 5, 2018" ("Forensic Report") is attached hereto to the *affidavit of Melissa Santistevan, attached hereto as* **Exhibit A**.

2.      The OSA initiated its Forensic Report after receiving "communications received through its special investigations intake process from a concerned Senator, the media and from Village council members expressing concerns about the Village of Tijeras' issuance of refunds to employees of alleged overpayments of PERA deductions." **Exhibit A,** *at 1 of Report*.

3.      The Forensic Audit primarily concerned the PERA Checks, totaling $64,423.65 delivered to thirteen Village employees and officials on or about January 8, 2018, including $10,624.55 to Plaintiff and $6,745.91 to then-Mayor Gloria Chavez. **Exhibit A** *at 1, 4 of Report*. The PERA Checks purported to refund these Village employees and officials all their PERA contributions dating back to 2006. **Exhibit A1** *at 1 of Report*. It unequivocally concluded that the PERA Checks were "improper and not supported by the Village's historical payroll documentation." **Exhibit A1** *at 1, 4 of Report*.

4.      Ms. Melissa Santistevan was the Special Investigations Division Director who extensively participated in the audit, and either prepared or approved all of the facts and opinions in the Report. **Exhibit A** *at ¶4-5*.

5.      The OSA relied in part on a letter from PERA Deputy Executive Director Greg Trujillo, provided on April 27, 2018.  Mr. Trujillo's letter referenced and relied upon a 2013 Village Resolution No. 314 The OSA concluded that it reflected the proper PERA contribution

3

rates for Village employees, and that a previous 2006 Resolution No. 193 was never implemented with respect to any PERA contributions. **Exhibit A** *at ¶6.*

6. Mayor Chavez now agrees with the OSA that "the checks should not have been issued." *See, deposition testimony of Gloria Chavez Page 144-145, lines 23-1, attached hereto as* **Exhibit B**. She also agreed to return the money she received. **Exhibit B**, *pages 145, lines 2-11.*

7. As of the date of this motion, Plaintiff still maintains, contrary to the opinions of the OSA, PERA, and even former Mayor Chavez, that the PERA Checks were proper. *See, deposition testimony of Diane Klaus, page 122, line 15-17, attached hereto as* **Exhibit C**. However, she admits that she lacks the proper accounting and legal experience to "fully answer" whether the PERA Checks "were right or wrong." **Exhibit C**, *page 122-123, lines 11-19.*

8. As of the date of her deposition, Plaintiff was "trying" to pay the money back. **Exhibit C**, *page 130, lines 3-15.*

**B.   There is no genuine dispute that Plaintiff was instrumental in the entire process leading to the issuance of the improper PERA Checks:**

1. Plaintiff served as Acting Clerk from March 2016 through April 2018, when the Village employed no other clerk. *See,* **Exhibit C**, *deposition testimony of Diane Klaus at page 16, lines 17-24.*

2. The Financial Director from June, 2017 through November 2019 was Ms. Darlene Coleman. *See, deposition testimony of Ms. Darlene Coleman at page 5, lines 9-12, attached hereto as* **Exhibit D**.

3. Ms. Coleman admittedly did not understand a lot of the duties of the position. **Exhibit D**, *Page 10, lines 2-8, page 11, lines 7-8.* As a result, Plaintiff was "involved a lot in the finance part" of Village governance and "there was a lot of stuff that [Plaintiff] would do" for her. **Exhibit D,** *page 10, lines 11-13; page 11, lines 7-8.* This included all "quarterly reports, PERA

reports, "just things that had to be done on a computer." ***Exhibit D***, *page 12, lines 3-8*. As a result of Ms. Coleman's lack of ability, Plaintiff mostly prepared the Village annual budgets. ***Exhibit D***, *page 21, lines 10-16; page 22, lines 18-22; page 23, lines 13-16*. Plaintiff provided the Village Council with year-to-date expenditure information that was contained in the financial statements. ***Exhibit D,*** *page 28-29, lines 23-3*. Ms. Coleman made all PERA payroll adjustments at the direction of Plaintiff, who would "tell her what the percentages were, and then [she] would just put them in." ***Exhibit D***, *page 34-35, lines 14-10; page 12-16*.[1]

    4.    In the course of the OSA investigation, and review of Village documentation, Ms. Santistevan independently concluded that the then-Acting Village Clerk, Diane Klaus, played an instrumental role in locating an error in the payroll records that resulted in the improper issuance of these checks. Except for the contracted fee accountant, Ms. Grannemann, she did not encounter any other Village employees who understood the purported basis for the PERA reimbursement, or who acted outside the direction of Mayor Chavez or Ms. Klaus to implement the payments. ***Exhibit A*** at ¶7.

    5.    Plaintiff's own testimony demonstrates her significant role in the issuance of the PERA Checks:[2]

    a.    Plaintiff located the resolution 191 that, in her opinion, meant that "the Village is supposed to be paying employees' portions of PERA." ***Exhibit C***, *pages 65, lines 22-24; page 67, lines 8-12*.

    b.    Plaintiff admits that but for her "finding" this resolution, the entire scandal of the PERA Checks would not have happened. ***Exhibit C***, *page 66, lines 17-21*.

---

[1] Recognizing that "the finance position was much bigger than her," Ms. Coleman subsequently asked for a demotion from Finance Director to Administrative Assistant. ***Exhibit D***, *page 29, lines 11-13; page 41, lines 1-8*.
[2] In her deposition, Plaintiff first claimed that she didn't have any role in issuing the checks. *Exhibit C, page 64-65, lines 25-3; 216, lines 2-5*. She then contradicted herself in many respects, as discussed herein.

5

    c.  Plaintiff sought out the Village's contractor, a C.P.A. named Theresa Grannemann, for her opinion on Resolution 191.  ***Exhibit C****, page 66-67, lines 24-6*.

    d.  At Mayor Chavez's request, Plaintiff spoke with both the Village Attorney Frank Coppler and with PERA on the issue, and personally reported back to the Mayor.  ***Exhibit C****, page 67-68, lines 20-21*.  Plaintiff exchanged several emails with Mr. Coppler on the issue, and he advised her to "lay it all out" for PERA to decide.  ***Exhibit C1****, referenced as Exhibit 13 at pages 92-94 of Exhibit C*.  Plaintiff claims she did so.  ***Exhibit C****, page 95, lines 6-11*.  However, all Plaintiff did was apparently confirm that Resolution 191 "was on file" in a telephone call with a PERA employee, discuss whether the maximum percentage of employer contribution was either 75% or 100%, and email the PERA employee and ask, in a three-line email, if PERA had any opinion on "reallocating current employee contributions in our system."  **Exhibit C1**; ***Exhibit C****, pages 95-98, lines 12-24*.  Moreover, Plaintiff cannot generally recall the substance of the telephone calls with PERA.  Exhibit C, page 99, lines 2-7.

    e.  At all relevant times, Plaintiff was aware of 2013 Resolution 314, which she understood related to the intent of the Council as to what Village employer PERA contributions should be.  ***Exhibit C****, pages 103-104, lines 14-5*.  Plaintiff failed to even mention this resolution in her discussions with the PERA employee, or to the Mayor or the C.P.A. contractor, Theresa Grannemann, because she did not consider its effect on what the proper Employer contribution should be.  ***Exhibit C,*** *page 104, lines 13-19*.  However, the OSA concluded, after consulting with PERA, that Resolution 314 dictated the proper PERA employer contribution, not 193.  **Exhibit A** *at ¶5*.

    f.  Presumably to adhere to their own modified version of financial controls, Plaintiff and the Mayor signed each others' checks; Ms. Coleman wrote the checks and also signed

them.  ***Exhibit C****, pages 77-78, lines 13-2*.

    g.  As Acting Village Clerk, Plaintiff was in charge of all payroll issues. ***Exhibit C****, pages 85-86, lines 22-25*.

  6.  Ms. Grannemann's role was to calculate the numbers for the PERA Checks. ***Exhibit C****, page 79, lines 12-25*.  Unlike Plaintiff, Ms. Grannemann never talked with PERA. ***Exhibit C****, page 84, lines 3-6*.

**C.**  **There is no genuine dispute that the PERA Checks required prior City Council Approval:**

  1.  The Forensic Report concluded that the PERA Checks, in addition to being improperly calculated based upon in improper analysis, should have been submitted to the Village Council for approval.  ***Exhibit A*** *at 2 of Report*.

  2.  Plaintiff agrees that the checks required prior Council approval; on this point she is in complete agreement with the OSA.  ***Exhibit C****, Page125, lines 5-6; page 135, lines 23-25*.

  3.  The Village Attorney, Frank Coppler, advised that the PERA Checks required Village Council approval.  ***Exhibit C****, page 69, lines 16-20*.  Plaintiff agreed that was good advice. ***Exhibit C****, page 72-73, lines 20-6*.

  4.  The Forensic Report concluded that the failure to seek approval, or even present, the PERA Checks to the Village Council resulted in a finding of potential violation of the Governmental Conduct Act; the Forensic Report noted both former Mayor Chavez and Plaintiff with respect to this finding.  ***Exhibit A*** *at 8 of Report*.

  5.  Mayor Chavez agrees, in hindsight, that it was a "bad decision" not to seek prior Council approval.  ***Exhibit B****, page 215, lines 1-18*.

**D.     Plaintiff should have directly informed the Village Council of the PERA Checks but failed to do so:**

1.      Plaintiff disagreed with Mayor Chavez's decision not to seek prior Council approval but did not voice her concerns to Mayor Chavez. ***Exhibit C**, page 124, lines 13-25*.

2.      Plaintiff agrees, hypothetically, that if she did have a role in having the PERA Checks issued, it would be an "improper" public act to personally benefit herself. ***Exhibit C**, page 216, lines 6-20*.

3.      Plaintiff was aware that Mayor Chavez delayed giving then-Councilor Bruton his check for over three months after she, Mayor Chavez, and the ten employees all received their checks. ***Exhibit B**, page 200, lines 3-9*. Mayor Chavez's reason for hiding the PERA Checks from Councilor Bruton, and presumably the entire Council, was because he was "cancelling meetings." ***Exhibit B**, page 200, lines 13-16*.

4.      Plaintiff offered several reasons for her failure to independently alert the Council regarding the improper checks:

   a.      Despite the fact that she was acting as Village Clerk and thus as the highest ranking appointed official, she felt she "had no duty" or "obligations" to the Council, only to the Mayor and the Village residents. ***Exhibit C**, page 29, lines 1-11*.

   b.      She also claimed that she couldn't go to the Council because the Mayor "was the boss" and she was just following orders. ***Exhibit C**, page 76, lines 21-25*.

   c.      She also feared discipline from the Mayor if she went to the Council with the improper payments because she "liked her job and wanted to keep it." ***Exhibit C**, page139, lines 13-20*. However, Mayor Chavez would not have disciplined her for doing so. ***Exhibit B**, page 206, line 2-15; page 208, lines 4-20*.[3] Furthermore, only the Village

---

[3] Of course, Plaintiff knows how to file a whistleblower claim in the event she would have gone outside her chain of

Council could fire her, after a recommendation by the Mayor. ***Exhibit C***, *page 76, lines 4-11*.

4.      According to Mayor Chavez, the Village Clerk was employed by the Village Council and owed it a duty to tell it when something's wrong. ***Exhibit B***, *page 173, lines 4-15*.

5.      If Plaintiff had disclosed the PERA Checks to a Village Councilor, he or she could have called a special meeting pursuant to the Village's Open Meetings Act Resolution. *See,* ***Exhibit C2***, *Open Meetings Act Resolutions attached as Exhibits 17 and 18 in deposition of Diane Klaus*. Plaintiff personally attested to this Resolution and was otherwise aware that the Council could call special meetings without mayoral approval. ***Exhibit C,*** *page 185-187, lines 22-25; page 262, lines 2-18*.

E.      **The reasons for Plaintiff's termination:**

1.      The Village terminated Plaintiff for the reasons stated in its Final Decision. *See, deposition testimony of Maxine Wilson pages 178, lines 3-7, attached hereto as* ***Exhibit E****; deposition testimony of Don Johnson, page 189, lines 2-7, attached hereto as* ***Exhibit F***.

3.      A copy of the Final Decision is attached hereto as ***Exhibit G***. *Admitted in Plaintiff's Response to First Motion for Partial Summary Judgment*. It included, *inter alia*, the following findings regarding the PERA Checks:

>    a.      …[Mayor] Chavez and Klaus continued their practice of hiding information from the Council by neglecting their duty to provide the council with information regarding unbudgeted expenditures, namely the January 5, 2018 unlawful PERA PERA expenditure of $64,523.65, including $10,752.58 paid Klaus and $8,707.99 paid Chavez, done without prior budget authority, which is in violation of §3-12-3A NMSA 1978 and the Governmental Conduct Act, §10-16-3(A-B)... ***Exhibit G*** ¶ *9*.
>
>    b.      The checks were cosigned by Klaus ostensibly under the authority of VOT resolution 2006-191 and despite contrary advice by the Village Attorney that said resolution was a cafeteria plan resolution, and was not relevant to issues

---

command and the Mayor disciplined her for it. ***Exhibit C***, *pages 75, lines 9-11*.

surrounding potential PERA PERAs and that before any checks were issued PERA must approve and the Council must be advised. ***Exhibit G*** *¶11.*

c. Together Chavez and Klaus signed the illegal PERA payments without informing the Council that the amounts were not budgeted in the Council's approved budget, or that a budget adjustment resolution would be necessary and failed to inform the Council of the issuance of the checks depriving the Council of its opportunity to exercise its lawful authority to approve and have lawful oversight over Village finances as required by NMSA 1978, §3-12-3A also depriving the public of its right to notice and opportunity to attend the council meeting to discuss the issuance of the checks… ***Exhibit G*** *¶19.*

d. The checks issued January 5, 2018 were not payroll checks, there was no withholding, those checks had to have been payment for services outside the employee payroll thus they constituted payments falling within Klaus' responsibilities as 'procurement person' in the job description… ***Exhibit G*** *¶20.*

e. Upon the election of Mayor Bruton in November, 2019, and the subsequent appointment of Michael Wismer as Village Clerk, Mr. Wismer was instructed to do an accounting of all Village personnel and property. ***Exhibit G*** *¶23.*

f. During Mr. Wismer's accounting of Village personnel and property, Mr. Wismer, in his capacity as Clerk, upon review of documentation related to the illegal PERA payments and his personal observations did reach a determination that there was cause for termination and a recommendation to Mayor Bruton that Klaus be terminated was in the best interests of the Village. ***Exhibit G*** *¶24.*

4. The termination notice initially provided to Plaintiff, signed by the Mayor and then-Village Clerk Michael Wismer, included similar concerns about the Employee Checks. *See, letter dated March 10, 2020, attached hereto as **Exhibit H**, as admitted in Plaintiff's response to previous Partial Motion for Summary Judgment*.

5. The relevant provision of the Village's Personnel Ordinance establishes the following grounds for termination:

**Section 11: Dismissal:** Employees may be dismissed for unsatisfactory performance, misconduct or other reasons deemed appropriate by the Village.

*See, **Exhibit I**, copy of relevant portion of Personnel Ordinance no. 157, previously admitted by Plaintiff in response to Defendants' First Motion for Summary Judgment*.

10

### III. ARGUMENT:

**A.      Legal Standard:**

Summary judgment is appropriate when the court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

Once the moving party meets this burden, F.R.C.P. 56(e) "requires the nonmoving party to go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial*.*" *Flowers v. Matheson Tri-Gas, Inc.,* No. CIV11900148RBSCY, 2021 WL 184462, at *1 (D.N.M. Jan. 19, 2021).  In a response to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Id*. (*citing Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988); *see also*, *Bryant v. O'Connor,* 848 F.2d 1064, 1067 (10th Cir.1988); 28 Federal Procedure, L.Ed. § 62: 538 (1984). The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party. *Conaway, supra.*

When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  *J.H. ex rel. J.P. v. Nation*, No.

11

CIV 12-0128 JB/LAM, 2015 WL 403596, at *13 (D.N.M. Jan. 19, 2015). "This doctrine developed most robustly in the qualified-immunity arena." *Id*.

**B.     The Court should grant summary judgment for all Defendants against Plaintiff's First Amendment claim because her admitted involvement in the improper PERA Checks is an affirmative defense as a matter of law.**

   *1.   Plaintiff bears the burden to show a Constitutional violation, whether as part of a qualified immunity analysis against the Individual Defendants, or otherwise as against the Village.*

In response to a motion for summary judgment by a public official asserting qualified immunity, a plaintiff bears the burden to demonstrate that "(1) the defendant violated the plaintiff's constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged unlawful activity." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (citing *Roosevelt–Hennix v. Prickett,* 717 F.3d 751, 753 (10th Cir.2013), *Allstate Sweeping, LLC v. Black,* 706 F.3d 1261, 1267 (10th Cir.2013) and *Castillo v. Day,* 790 F.3d 1013, 1019 (10th Cir.2015)).[4] With respect to this first prong, the facts before the Court must "suffice to show" that "a reasonable jury" could find that a Constitutional violation occurred. *Id*.

In contrast to public officials, qualified immunity does not apply to municipal institutional defendants. *See,* e.g., *Cordova v. Aragon,* 569 F.3d 1183, 1193–94 (10th Cir. 2009). However, Plaintiff bears a similar burden to show a Constitutional violation against the Village. Generally, in support of a claim against a municipality pursuant to 42 U.S.C. 1983, a plaintiff must show two elements: "(1) a municipal employee committed a constitutional violation, and (2) a municipal

---

[4] The Defendants filed a separate motion for partial summary judgment on behalf of the Individual Defendants on grounds of qualified immunity as against both federal claims (i.e., the First Amendment and Contracts Clause claims). See Dkt no. 125. That motion addressed prong (2) of the qualified immunity analysis in *Cox, supra* – whether the right was "clearly established." The qualified immunity analysis of prong (1) – whether there is a Constitutional violation – relies upon the same "affirmative defense" analysis of the same facts as against the WPA claim. This affirmative defense analysis applies as against all Defendants on both the WPA and First Amendment claim. Because of such similarity of analysis, the qualified immunity analysis on prong (1) is part of this motion, not the previous motion at Dkt no. 125.

policy or custom was the moving force behind the constitutional deprivation." *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009).

Thus, whether as part of a qualified immunity defense by the Individual Defendants, or as part of a more "generic" summary judgment motion by the Village, Plaintiff bears to burden to show a violation of the First Amendment. *Cox, supra; Cordova, supra*.

> 2. *A reasonable factfinder would have to accept the affirmative defense against a First Amendment claim that the Village terminated Plaintiff for her admitted involvement in objectively improper PERA Checks to herself and other Village employees without Village Council approval.*

Within the context of summary judgment, the Tenth Circuit analyzes a summary judgment motion against First Amendment claims brought by a terminated employee pursuant to 42 U.S.C. 1983 as follows:

> a First Amendment retaliation plaintiff must prove (using either direct or circumstantial evidence) that her political affiliation was a substantial or motivating factor behind the adverse employment action. If the plaintiff succeeds in proving so much, the defendant-employer may yet prevail by way of affirmative defense if it can prove by a preponderance of the evidence that it would have reached the same adverse employment decision even in the absence of the protected conduct…[A] defendant seeking to prevail at summary judgment must show a reasonable factfinder either would have to reject the plaintiff's claim on the merits or accept its affirmative defense

*Walton v. Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016) (upholding summary judgment against both the State Land Commissioner and the State Land Office, the former asserting qualified immunity). In *Walton v. Powell*, the Tenth Circuit rejected the "*McDonnell Douglas"* framework for analyzing summary judgment in discrimination cases, citing *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Furthermore, the political association must be a "substantial motivating factor" in the employer's decision to terminate. *Walton v. New Mexico State Land Off.,* No. CV 13-0343 JB/KBM, 2016 WL 9021835, at *12 (D.N.M. Dec. 31, 2016) (where the Court explicitly

13

eliminated the "or" between "substantial" and "motivating" as otherwise stated in *Walton v. Powell, supra*) (Browning, J.); *see also Roberts v. Winder*, No. 20-4082, 2021 WL 4955462, at *12 (10th Cir. Oct. 26, 2021) (where no reasonable factfinder could conclude that political association was a substantial motivating factor in light of unrebutted justification).

Defendants thus bear the burden of proving their affirmative defense, namely, that they terminated Plaintiff for her misconduct, specifically, her involvement in the objectively improper PERA Checks to herself and other Village employees without Village Council approval.

In this case, the material facts submitted herein establish beyond genuine dispute that the PERA Checks were improper and should not have been issued.  **MFA-1 through A-8.**  There is also no genuine dispute that Plaintiff was instrumental in the entire process leading to the issuance of the improper PERA Checks.  **MF B-1 through B-6.**  The evidence submitted herein blatantly contradicts her protestations to the contrary.  There is also no genuine dispute that the PERA Checks required prior City Council Approval.  **MF C-1 through C-5.**  There is also no genuine dispute that Plaintiff should have directly informed the Village Council of the PERA Checks but failed to do so.  **MF D-1 through D-5**.  Finally, there is no genuine dispute that the Village terminated Plaintiff for both her role in the issuance of the PERA Checks and her failure to inform the Council or otherwise first seek Council approval.  **MF E-1 through E-4**.

A reasonable factfinder presented with these incontrovertible facts could only conclude that a preponderance of the evidence supports the conclusion that the Village Council would have terminated her even in the absence of Plaintiff's alleged protected conduct, here, her political association with the former Mayor.  Her actions relating to the PERA checks fall within the scope of "unsatisfactory performance, misconduct or other reasons deemed appropriate by the Village" for termination.  **MF E-5**.  No reasonable employer should retain an employee who flouted internal

controls for their own significant financial gain.  A reasonable factfinder would have to reject the Plaintiff's claim on the merits and accept the Village's justification.   Not only does it rely upon the neutral determinations of the OSA, but it is directly supported by Plaintiff's and former Mayor Chavez's deposition testimony, who Plaintiff alleges to have been politically aligned against the Defendants.  *See, Complaint at ¶116*.

Moreover, both the gravity and scope of Plaintiff's misconduct argue in favor of Defendants' affirmative defense.  As opposed to a nominal amount of money, Plaintiff's misconduct involved over ten thousand dollars of personal improper gain and warranted a recommendation by the OSA of violations of the Governmental Conduct Act.  **MF A-1**, *at 6 of Report*.  As a matter of law, no reasonable factfinder could conclude that Plaintiff's political association with former Mayor Chavez was a substantial motivating factor in her termination.  It would be arbitrary and require rampant speculation to so decide in Plaintiff's favor; as a matter of law, Plaintiff cannot ask a reasonable factfinder to do so.  *Flowers v. Matheson Tri-Gas, Inc., supra; J.H. ex rel. J.P. v. Nation, supra*.

Based on the forgoing, the Court should dismiss Plaintiff's First Amendment Claim in Count VI of her complaint pursuant to F.R.C.P. 56.  *Walton v. Powell, supra*; *Walton v. New Mexico State Land Off., supra*.

C. **The Court should grant summary judgment as against Plaintiff's WPA claim because her admitted involvement in the improper PERA Checks is an affirmative defense as a matter of law.**

The WPA provides an "affirmative defense" to an allegation of wrongful termination. Pursuant to Section 10-16C-4(B) NMSA 1978, of the WPA, entitled "Right to civil action for damages; affirmative defenses; remedy not exclusive":

> It shall be an affirmative defense to a civil action brought pursuant to this section that the action taken by a public employer against a public employee was due to the

15

> employee's misconduct, the employee's poor job performance, a reduction in work force or other legitimate business purpose unrelated to conduct prohibited pursuant to the Whistleblower Protection Act and that retaliatory action was not a motivating factor.

*See, e.g., Maestas v. Town of Taos*, 2020-NMCA-027, ¶ 8, 464 P.3d 1056, 1060 (characterizing this affirmative defense as "justifiable termination."). As an affirmative defense, the employer bears the burden to prove such legitimate reasons for the action taken. *Velasquez v. Regents of N. New Mexico Coll.,* 2021-NMCA-007, ¶ 42, 484 P.3d 970, 984, *cert. denied* (Feb. 12, 2021) (upholding a judgment in favor of an employee where alleged poor job performance was an "abrupt and dramatic change" in evaluations immediately after the protected disclosure, and Plaintiff testified "that the post-communication evaluations did not accurately reflect the quality of her work").

Here, similar to Plaintiff's First Amendment claim, the material facts not subject to genuine dispute establish that the Defendants terminated Plaintiff for her misconduct unrelated to any whistleblowing alleged in her complaint. In this case, the material facts submitted herein establish beyond genuine dispute that the PERA Checks were improper and should not have been issued. **MFA-1 through A-8.** There is also no genuine dispute that Plaintiff was instrumental in the entire process leading to the issuance of the improper PERA Checks. **MF B-1 through B-6.** There is also no genuine dispute that the PERA Checks required prior City Council approval. **MF C-1 through C-5.** There is also no genuine dispute that Plaintiff should have directly informed the Village Council of the PERA Checks but failed to do so. **MF D-1 through D-5**. Finally, there is no genuine dispute that the Village terminated Plaintiff for both her role in the issuance of the PERA Checks and her failure to inform the Council or otherwise first seek Council approval. **MF E-1 through E-4**.

Again, the gravity and scope of Plaintiff's misconduct cannot lead to any other reasonable

result.  Her actions relating to the PERA checks fall within the scope of "unsatisfactory performance, misconduct or other reasons deemed appropriate by the Village" for termination. **MF E-5**.  As a matter of law, it would require rampant speculation for a reasonable factfinder not to accept this affirmative defense or to find this a case of justifiable termination.

Based on the forgoing, the Court should dismiss Plaintiff's WPA Claim in Count IV of her complaint pursuant to F.R.C.P. 56.  Section 10-16C-4(B) NMSA 1978; *Town of Taos, supra*.

WHEREFORE, pursuant to F.R.C.P. 56, the Court should dismiss Counts IV and VI as against Defendants and grant such other and further relief as the Court deems proper.

Respectfully submitted,

ORTIZ & ZAMORA, ATTORNEYS AT LAW, LLC

By:   /s/ Tony F. Ortiz
      Tony F. Ortiz
      Daniel R. Rubin
      Jessica R. Terrazas
      Nicholas A. Govea
      2011 Botulph Road, Suite 200
      Santa Fe, NM  87505
      (505) 986-2900
      tony@ortiz-zamora.com
      daniel@ortiz-zamora.com
      *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 18th day of November, 2021, a copy of the forgoing was filed electronically via CM/ECF, and that a copy of the foregoing pleading was e-mailed to the following party of record:

Duff Westbrook
Sanders & Westbrook, P.C.
102 Granite Avenue
Albuquerque, NM 87102
(505) 243-2243
duff@sanwestlaw.com

                                                By:    /s/ Daniel R. Rubin
                                                         Daniel R. Rubin